**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02418

MARISA JONES,

      Plaintiff,

v.

ARROW ELECTRONICS, INC., a New York corporation,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff, Marisa Jones, by and through her attorneys, Sweeney & Bechtold, LLC, hereby submits her Complaint against the above-named Defendant as follows:

### INTRODUCTION

1. This is an employment discrimination suit brought by a former employee of Arrow Electronics, Inc. ("Arrow") who was discriminated and retaliated against during her employment. This included being constructively discharged after five years of satisfactory or better performance in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").

### PARTIES

2. Plaintiff Marisa Jones is a resident of the State of Colorado.

3. Defendant Arrow is a New York corporation authorized to do business in Colorado.

4. Arrow's principal office is located at 9201 E Dry Creek Road, Centennial, CO 80112.

## JURISDICTION AND VENUE

5.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343, in that this action arises under federal law, specifically Title VII.

6.  Venue is proper in this judicial district pursuant to 28 U.S.C.§ 1391(b), as the unlawful employment practices alleged herein were committed within this judicial district.

7.  At all relevant times, Defendant Arrow was covered by the definition of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

8.  The procedural prerequisites for the filing of this suit have been met: Plaintiff filed two charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and received Notice of Right to Sue letters for both.

## SPECIFIC ALLEGATIONS

9.  Arrow specializes in distribution and value added services relating to electronic components and computer products.

10. Plaintiff is a woman.

11. Plaintiff worked for Arrow from October 1, 2015 until August 7, 2020.

12. Plaintiff's performance was satisfactory or better at all times throughout her employment.

13. Plaintiff began working for Arrow in an Architect Contractor position in October 2015.

14. Arrow hired Plaintiff to implement a Global Finance System known as Hyperion.

15. Arrow hired Plaintiff as a full-time employee in April 2016 as a Solution Architect, a level 13 position, in the Finance Systems Group which supported the Finance Department.

16. As a Solution Architect, Plaintiff was an IT employee who was responsible for designing new applications and strategic IT planning for entire divisions of Arrow.

17. Plaintiff reported to then-Vice President ("VP") Carol Baronofsky, Chief Financial Officer ("CFO") Chris Stansbury, who managed the Hyperion project, and Steven Johnson, who was the then-Director of Financial Systems.

18. Plaintiff and Mr. Johnson had numerous discussions where Mr. Johnson told Plaintiff he wanted to hire her as a Director to fulfill his role once the Hyperion project was completed as he anticipated being promoted.

19. In April 2017, the Financial Systems Group was moved into the IT department under Vice President of Information Technology, Alec Hayes.

20. Arrow terminated Steven Johnson in September 2017.

**Once Plaintiff was under the Direction of New Management, Arrow Started to Discriminate Against her Based on her Sex**

21. After Steven Johnson's termination, Plaintiff began to report to the new Information Technology Director, Michael Johnson.

22. Plaintiff continued performing her job duties as a Solutions Architect, including leading Steering Team meetings regarding the Hyperion project.

23. Mr. Johnson treated Plaintiff discriminatorily in a number of ways including:

    a. Replacing Plaintiff as the Steering Team lead with himself, although he admitted he did not have background in finance;

    b. Instructing Plaintiff to not answer questions posed by the team and to defer all questions to him;

    c. Instructing Plaintiff to take notes in front of the entire Steering Team, of whom the majority were male, which was deeply humiliating to Plaintiff as she had previously led the meetings;

3

    d.   Prohibiting Plaintiff from communicating directly with the finance leadership team, as she normally did as their point of contact on a monthly basis prior to his leadership;

    e.   Excluding Plaintiff from all meetings regarding the Hyperion project, except for Steering Team meetings; and

    f.   Expecting Plaintiff to prepare all meeting slide decks and to be available during meetings via Skype so that he could ask Plaintiff questions, to which he admitted not knowing the answers.

### Arrow's Management Consistently Rated Plaintiff's Performance Lower than Deserved and Dismissed Plaintiff's Success.

24.   Arrow's management was instructed to fit the performance evaluation ratings of its employees within a standard bell curve.

25.   In order to do so, directors and upper-level management would intentionally lower some employees' ratings to fit within the bell curve.

26.   Mr. Johnson and Mr. Hayes were required to lower these rating after receiving input from lower-level managers and did so subjectively.

27.   Mr. Johnson, Mr. Hayes, and other managers, hand-picked male employees they wanted to promote and rated them higher on the bell curve at the expense of rating Ms. Jones and other women lower on the same bell curve.

28.   For the 2017 calendar year, Mr. Johnson rated Plaintiff with a much lower rating than she deserved.

29. Mr. Johnson consistently ranked Plaintiff as merely meets expectations even though Plaintiff was performing at a higher level.

30. Plaintiff had several meetings with Mr. Johnson to discuss her career path and her lower than justified performance ratings during the performance evaluation reviews.

31. During Plaintiff and Mr. Johnson's conversations about Plaintiff's performance, Mr. Johnson would tell Plaintiff "off the record" that Mr. Hayes did not believe Plaintiff was an architect and that Mr. Hayes felt the Hyperion project was a failure.

32. In reality, the Hyperion project was a great success as it accomplished its mission, which was to create a consolidation and planning application that would allow employees to report their monthly numbers, planning, and budgeting.

33. Hyperion was completed on time, within 10% of its budget, and deemed a success by Arrow's CIO and other VPs and executives.

34. Mr. Johnson never gave Plaintiff specific reasons as to why Mr. Hayes or the IT team allegedly felt that the Hyperion project was a failure.

35. In 2018, the Hyperion project was completed. As a result, Plaintiff's title changed from Solutions Architect to IT Manager.

36. Throughout 2018, Mr. Johnson tasked Plaintiff with processing tickets for the Finance Systems Group, which was essentially a customer service role.

37. Plaintiff's skills were significantly underutilized in this role.

38. Over the course of 2018, Plaintiff told Mr. Johnson several times that processing tickets was not within the purview of her role as an IT Manager and that her experience as an

Enterprise Architect and Business Intelligence ("BI") specialist warranted a more strategic role.

39. Mr. Johnson told Plaintiff that her expectations were "too high", and that leadership did not see her the way she saw herself.

40. In June 2018, Vice President of Treasury Bill Dakin invited Plaintiff to meet with CFO Mr. Stansbury and himself, to develop IT architecture for the Treasury group.

41. At the meeting, Plaintiff proposed creating a finance roadmap that would include a three-year strategy for all finance departments, which would ultimately save the company $9 million.

42. Mr. Stansbury was so fond of Plaintiff's proposal that he spoke with the CIO about implementing it.

43. Mr. Johnson later chastised Plaintiff for taking this meeting, stating that Mr. Hayes was upset because she was supposedly not an Enterprise Architect and it was not her "role" to recommend a course of action to Mr. Stansbury.

44. In late 2018, the IT group held an internal IT summit.

45. In early October 2018, Plaintiff asked to present at this summit.

46. Mr. Johnson denied Plaintiff's request, telling her that Mr. Hayes did not see her as a "BI person."

47. This was despite the fact that Plaintiff had six years of BI experience prior to joining Arrow, and had written a relevant whitepaper and presented it at an Oracle conference.

48. Additionally, Arrow allowed a less experienced male, who only had half of Ms. Jones's experience, to present at this summit.

6

49. On October 11, 2018, Plaintiff sent Mr. Johnson the whitepaper she authored and other documents demonstrating her experience in BI.

50. On November 5, 2018, Plaintiff asked Mr. Johnson if she could simply attend the summit without presenting; Mr. Johnson denied this request as well.

51. Mr. Johnson then directed Plaintiff to speak with Mr. Hayes if she wanted to change how she was perceived.

52. On November 6, 2018, Plaintiff approached Mr. Hayes and asked to speak to him regarding Plaintiff's career path and her professional background.

53. Plaintiff and Mr. Hayes discussed Plaintiff's accomplishments and Mr. Hayes asked Plaintiff to provide him with her resume, which she did; however, nothing came of this.

54. On November 7, 2018, Mr. Johnson told Plaintiff that she made "emotional decisions" because she had approached Mr. Hayes to discuss her career without involving him.

55. Plaintiff told Mr. Johnson that his characterization was unfair and that he would not have said such things to Plaintiff if she was a male employee.

56. On December 1, 2018, Mr. Johnson transferred Plaintiff to Director Dan Bergeron's group which was housed in Mr. Hayes's department.

57. Due to the transfer, Plaintiff's title changed from IT Manager to Senior Manager of Peripheral Applications and Automation ("PAA"), her second title change within 2018.

58. This position was more in line with Plaintiff's skills and aligned with her desired career path.

59. Plaintiff and Mr. Bergeron discussed how Plaintiff could support several projects for his Europe-based team; shortly thereafter, Plaintiff took leadership over the team.

60.   Plaintiff was also responsible for working in the Robotic Processing Automation ("RPA") initiative in her new capacity.

61.   In April 2019, Plaintiff received an annual performance review for the 2018 calendar year that had been completed by Mr. Johnson.

62.   Mr. Bergeron told Plaintiff that he disagreed with Mr. Johnson's rating in that it was lower than what her performance warranted.

63.   Regardless, Plaintiff continued to perform exceedingly well in her new role.

64.   Plaintiff's new team provided feedback to Mr. Hayes and Plaintiff that they were very satisfied with her management and that it was the first time in years that they had a manager who communicated with them, was very engaged, and took action to move forward.

**Arrow Continued to Discriminate Against Plaintiff by Repeatedly Changing her Title and Moving her From Group to Group, Sometimes Without a Role.**

65.   At the beginning of May 2019, Plaintiff was scheduled to present the RPA program to teams across IT at a three-day workshop.

66.   The week before the workshop, Mr. Bergeron informed Plaintiff that Arrow would be removing the RPA initiatives and program from her control and giving them to a junior male IT manager, Puneet Chowdhary.

67.   At the time, Mr. Chowdhary had been an Arrow employee for just over two years, one year less than Plaintiff.

68.   Arrow never gave Plaintiff a reason for the transition.

69.   Following this change, Arrow promoted Mr. Chowdhary to Director.

70.  Between May and August 2019, when Plaintiff was attending general meetings often, Mr. Hayes treated Plaintiff with blatant hostility during meetings in front of their colleagues until Plaintiff started to communicate with Mr. Johnson instead.

71.  In those same meetings, Mr. Hayes would question Plaintiff's strategy for certain initiatives without justification and in a condescending manner in front of their colleagues.

72.  On August 26, 2019, Plaintiff applied for an Enterprise Architect position, which was a level 14 position.

73.  Arrow did not offer Plaintiff the position despite the fact that she had demonstrated her skills in architecture when she worked with CFO Mr. Stansbury and CIO Mr. Melvin the preceding year.

74.  On August 27, 2019, Mr. Hayes called Plaintiff into his office where he told Plaintiff that he was making changes and that her team was to be completely removed from her management.

75.  Mr. Hayes informed Plaintiff that she would start reporting to Samir Kumar, a Director, as Mr. Bergeron was leaving the company.

76.  On August 30, 2019, Mr. Kumar told Plaintiff that she was going to be a Project Manager, her third title change within 2 years, only 8 months after she became Senior Manager of PAA.

77.  Mr. Kumar explained that Plaintiff would be leading a new team of Solution Architects.

78.  At the time, Plaintiff expressed her frustration about the new assignment, as being Project Manager did not align with her career goals of becoming an Enterprise Architect, since as a Project Manager, she would manage the architects as opposed to being one.

79.   On September 11, 2019, Plaintiff and Mr. Johnson had a meeting during which Mr. Johnson said that he did not know why the company put Plaintiff in this new role because "it's not like [Plaintiff] can make any changes in the group."

80.   Plaintiff asked why Mr. Hayes continued to give her these roles when he apparently did not believe she could be successful.

81.   In response, Mr. Johnson told Plaintiff, "off the record, [Mr. Hayes] doesn't know what to do with you. He's just waiting for you to leave."

82.   Plaintiff expressed to Mr. Johnson that Mr. Hayes treated women in a rude and discriminatory manner, and that several of her female colleagues and Plaintiff were considering reporting his conduct to Arrow's Human Resources ("HR").

83.   Two days after Plaintiff's conversation with Mr. Johnson, Mr. Kumar informed Plaintiff that she was being moved, yet again, to the Digital group, her fourth move within two years.

84.   Mr. Kumar told Plaintiff that he was unsure of what her role would be in the group but that she needed to speak with Michelle Moore, the Director of the Digital Development teams in IT.

85.   When Plaintiff met with Ms. Moore later that day, Ms. Moore stated that she had neither a role for Plaintiff nor enough duties for her to fill her time but that they were making some changes and she would have a more permanent position for Plaintiff at some point.

86.   Ms. Moore informed Plaintiff that Plaintiff would now be reporting to Preston Smits, a Manager.

87. Plaintiff told Ms. Moore that she was frustrated with having four different roles in such a short period.

88. Ms. Moore told Plaintiff that she would just need to prove herself in Digital.

89. On or around September 17, 2019, Plaintiff expressed her concern to Mr. Johnson that he and Mr. Hayes had derailed her career by moving her to different teams and not placing her in roles that utilized her skills and background in architecture.

**Plaintiff Engaged in Further Protected Activity**

90. On September 23, 2019, Plaintiff submitted a formal complaint of sex discrimination against Mr. Hayes to the Director of HR, Linda Cherry.

91. In her complaint, Plaintiff detailed several of the events that had taken place over the last several months, including the fact that Mr. Hayes recently moved her to Digital without having a role for her and that his behavior was negatively impacting her career path and creating a toxic work environment.

92. Plaintiff gave Ms. Cherry the names of other female employees who had similar complaints against Mr. Hayes.

93. Plaintiff also told Ms. Cherry that Mr. Hayes consistently hired male contractors for high-level roles and that he bestowed accolades upon them and promoted them at the expense of women whom he would treat in a demeaning and condescending manner.

94. On September 30, an employee of Preston Smits who was leaving the company, asked Plaintiff to take over his role, a Tech Support position in which she would be required to perform customer service tasks.

95.   Plaintiff told Mr. Smits that she was completely humiliated by this news because this role would be a demotion.

96.   Mr. Smits acknowledged to Plaintiff that he could understand why she was upset at the prospect of reporting to him given that they were both Senior Managers.

97.   On October 1, Plaintiff brought her concerns about the role and Arrow's habit of repeatedly moving her to different groups again to Ms. Moore.

98.   Ms. Moore dismissed Plaintiff's concerns, saying that she had heard this from Plaintiff before and did not need to hear it again.

99.   Ms. Moore then told Plaintiff to "get over it" and that Arrow "[does] not have enterprise architect roles," which was blatantly false.

100.  Ms. Moore then admitted she understood that training for a tech support position was a demotion from Plaintiff's prior position.

101.  Around October 2019, about three months after Plaintiff started reporting to Mr. Smits, Arrow moved Plaintiff for a fifth time into a new position as a Product Manager reporting to another Senior Manager, Matthijs van der Vegte.

102.  On October 2, 2019, Plaintiff emailed Ms. Cherry and asked for a case number regarding her formal HR complaint and for the company's Alertline number, which was an internal complaint hotline for Arrow employees.

103.  Plaintiff had to ask two more times before Ms. Cherry finally provided the information.

104.  Plaintiff then called the Alertline number and filed a formal complaint against Mr. Hayes, Mr. Johnson, Mr. Kumar, and Ms. Cherry.

105.  On October 9, 2019, Plaintiff met with a representative of Arrow's Legal Department.

106. Plaintiff told the legal department about Plaintiff's previous complaints and the fact that women were being retaliated against for making complaints of discrimination.

107. That same week, IT Director, Bart Luyckx, told Plaintiff that she should start planning a severance package since Arrow would not let her stay after she filed a complaint with the legal department.

108. On October 17, 2019, Plaintiff applied for a promotion to GES Business Operations Management position, a Level 14 position.

109. Arrow's policy is that, for every internal application, the HR recruiter shall contact internal applicants to have initial interviews and provide employees with the opportunity to discuss the position.

110. Arrow failed to follow its policy regarding Plaintiff's application for the GES Business Operations Management Position.

111. Arrow ultimately chose an external female candidate.

112. When Plaintiff asked HR why the company did not offer her an interview, an HR representative said that Arrow assumed Plaintiff was not interested.

113. On November 21, 2019, HR told Plaintiff that it had discovered "substantial issues" during the course of its investigation, which it would address with an organizational re-design, training, and follow up with individual employees.

114. Regardless, Plaintiff had continuing concerns about discrimination, including being passed over for promotions and repeatedly moved to different roles, which she reiterated to Carine Jean-Claude in Arrow's Legal Department.

115. In response, Ms. Jean-Claude made a number of promises on behalf of Arrow, including that:

    a. Mr. Melvin and the Vice President of HR were prepared to work with Plaintiff;

    b. Arrow was committed to finding Plaintiff a new position that would fit her skill sets; and

    c. Arrow was making changes "from the top down," which included no longer employing Mr. Hayes.

116. With the exception of Mr. Hayes's separation, which did not occur for another six months, Arrow failed to follow through with any of these promises.

**Arrow Continued to Retaliate Against Plaintiff After she Voiced her Concerns.**

117. Plaintiff stayed with Arrow for seven months after her conversation with Ms. Jean-Claude.

118. During those seven months, Arrow continued its discriminatory and retaliatory treatment of Plaintiff, including:

    a. Requiring Plaintiff to be in the office from 8:30 am to 5:30 pm after the advent of the COVID-19 epidemic while Arrow allowed other employees in her group, a majority of whom were male and none of whom engaged in protected activity, to work a modified schedule with frequent work from home;

    b. Plaintiff's supervisor only requiring others in her group to be on site two or three days a week;

    c. Initially denying Plaintiff's request to work from home so that she could care for her school-aged son because it was not in writing, which was not required of other employees in her group requesting work from home;

    d.   Delegating responsibility to Plaintiff for a system, Navison, that was soon to be obsolete; and

    e.   Moving Plaintiff yet again – for the sixth time in two years – to a new project.

119. When Plaintiff expressed concerns to Mr. van der Vegte that her assignments felt discriminatory and retaliatory, he simply dismissed Plaintiff's concerns.

**Plaintiff was Compelled to Resign.**

120. Arrow's discriminatory and retaliatory treatment of Plaintiff stilted Plaintiff's career progression.

121. Arrow's treatment of Plaintiff also caused her mental health to decline to the extent that she sought therapy.

122. As a result, Plaintiff became depressed to the point of having suicidal ideations.

123. Plaintiff had no other choice but to resign from her position on August 7, 2020.

124. On or around February 2, 2020, Plaintiff filed charge of discrimination no. 541-2020-01069 with the EEOC in which she claimed that Arrow discriminated against her based on her sex and retaliated against her for opposing this unlawful treatment.

125. On or around September 9, 2020, Plaintiff filed charge of discrimination no. 541-2021-00083 with the EEOC in which she claimed that Arrow discriminated against her based on her sex and retaliated against her for opposing this unlawful treatment.

126. The EEOC issued Notice of Right to Sue letters for both charges on June 10, 2021.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended)

127. The foregoing allegations are realleged and incorporated herein by reference.

128. Arrow subjected Plaintiff to less favorable terms and conditions of her employment based on sex. This treatment included, but is not limited to: delegating job duties to Plaintiff without increasing her compensation; subjecting Plaintiff to hostility and unfair scrutiny; belittling and demeaning Plaintiff in front of others; failing to promote Plaintiff to a Level 14 position, including the Enterprise Architect or GES manager role despite her qualifications; placing Plaintiff in different groups without having a role for her; assigning Plaintiff to low-level job duties and roles that were beneath her skills and abilities; consistently rating her as merely meets expectation on performance evaluation when Plaintiff's performance justified a higher rating; removing Plaintiff from her roles, replacing her with less experienced males and subsequently promoting those same males to even better position; and ultimately constructively discharging her.

129. Arrow's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

130. Arrow's conduct discriminated against Plaintiff on the basis of her sex in violation of Title VII.

131. As a direct and proximate result of Arrow's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**SECOND CLAIM FOR RELIEF**
(Retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended)

132. The foregoing allegations are realleged and incorporated herein by reference.

133. Plaintiff participated in statutorily protected activity by opposing practices targeted at her that were unlawful under Title VII.

134. As a result of Plaintiff's protected opposition to discrimination, Arrow retaliated against her by subjecting her to less favorable terms and conditions of employment, as described in this Complaint, including, but not limited to: treating her in a demeaning manner; failing to investigate her concerns of sex discrimination and retaliation; moving her from group to group; failing to provide information that was requested in regard to the complaint; and ultimately constructively discharging her.

135. Arrow's actions taken against Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

136. Arrow's conduct violated Title VII.

137. As a direct and proximate result of Arrow's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiff Marisa Jones respectfully requests that this Court enter judgment in her favor and against Defendant Arrow and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B. Back pay and benefits;

C.  Reinstatement or front pay and benefits;

D.  Injunctive and/or declaratory relief;

E.  Punitive damages;

F.  Attorney fees and costs of the action, including expert witness fees, as appropriate;

G.  Pre-judgment and post-judgment interest at the highest lawful rate; and

H.  Such further relief as justice allows.

### <u>PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.</u>

Respectfully submitted September 8, 2021.

By:     SWEENEY & BECHTOLD, LLC

<u>s/Charlotte N. Sweeney</u>
Charlotte N. Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

<u>s/Ariel B. DeFazio</u>
Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
6565 S Syracuse Way
Apt 2302
Centennial, CO 8011

**CERTIFICATION OF GOOD STANDING**

I hereby certify that I am a member in good standing of the bar of this Court.

By:    SWEENEY & BECHTOLD, LLC

s/Charlotte N. Sweeney
Charlotte N. Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com